WILLIAM H. MATHIS AND MARY BURNS MATHIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mathis v. Commissioner
Docket No. 37395-85.
United States Tax Court
T.C. Memo 1989-254; 1989 Tax Ct. Memo LEXIS 254; 57 T.C.M. (CCH) 519; T.C.M. (RIA) 89254; May 24, 1989; As corrected May 25, 1989 David H. Flint and Edward H. Brown, for the petitioners. Meryl J. Fuchs-Goldberg, *255 for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to Tax
Taxable Year Ended
Deficiency
[1] Section 6653(a) December 31, 1979
$ 15,671.00
$ 938.70  December 31, 1980
36,136.00
1,974.15
After concessions, [2] the issues to be decided are: (1) the fair market value of the subject property contributed by petitioner William H. Mathis to the Clemson University IPTAY Club and the Clemson University Foundation on December 26, 1979; and (2) whether petitioners are liable for an addition to tax for negligence under section 6653(a) for the taxable years 1979 and 1980. *256 FINDINGS OF FACT Some of the facts have been stipulated. Petitioners and respondent each objected to certain stipulated facts on the grounds of relevancy and materiality. The stipulated facts that we find to be relevant and material are included in the following statement of facts. Petitioners William H. Mathis (hereinafter when used in the singular form, "petitioner" refers to William H. Mathis) and Mary Burns Mathis resided in Atlanta, Georgia, when they filed their petition in this case. Petitioners were husband and wife during the years at issue. On or about January 25, 1966, petitioner acquired real property (hereinafter "the subject property") designated as parcel 29 of Land Lot 385 of the 6th District in Fulton County, Atlanta, Georgia. Land Lot 385 actually lies in the 18th District of Fulton County, but it is also referenced as being located in the 6th District of Fulton County. In 1966, Land Lot 385 was zoned as R-2 property (residential, single family dwellings on one acre lots). When petitioner purchased the subject property, it was improved with a four-column, two-story wood frame colonial house with a full basement and a screened-in porch. The house was *257 in poor condition. After petitioner bought the subject property, the house was destroyed by fire. Petitioner was compensated for his loss by the insurance proceeds he received. On or about September 19, 1966, petitioner granted a right of way on .092 acres of his property to the Georgia State Department of Transportation for the construction of North Fulton Expressway (Georgia 400). Petitioner received compensation for granting the right of way. Prior to 1979, the Board of Commissioners of Fulton County adopted a comprehensive plan through the year 2000, for the use and development of property located in North Fulton County, which includes the subject property. The comprehensive land use plan shows the subject property as residential property with four to ten units per acre. In 1979, the Fulton County Tax Board of Tax Assessors valued the subject property at $ 9,130 and assessed it at $ 3,650. On or about April 10, 1979, an application to the Fulton County Planning Commission to rezone Land Lot 385 from R-2 (residential) property to T-R Conditional (Townhouse/Residential Conditional) property was submitted on behalf of petitioner and certain other parties. The petition was *258 approved by the Fulton County Board of Commissioners on June 6, 1979. On December 26, 1979, petitioner executed a deed of gift in which he donated his .946 acre of undeveloped real property designated as parcel 29 of Land Lot 385 in the 6th District of Fulton County, Georgia, to the Clemson University IPTAY Club and to the Clemson University Foundation. As a condition of the gift, petitioner specifically instructed the donees that they were not to dispose of the subject property until the expiration of seven years from the date of gift, a condition to which all parties agreed. However, the deed of gift did not contain any restriction on the donees' ability to dispose of the subject property. On the date of the gift by petitioner, the IPTAY Club of Clemson University and the Robert C. Edwards Endowment Fund of the Clemson University Foundation (the donees) were qualified organizations under section 170(b)(1)(A). At the time of the donation, water, gas, and electricity were available at the subject property, but sewer was not available. In order to determine the value of the subject property at the time of the contribution, petitioner asked Dudley Ottley, a real estate broker, *259 to appraise the property. Petitioner asked Mr. Ottley to appraise the property at its highest and best use, which petitioner told Mr. Ottley he thought would be as commercial property. Mr. Ottley grew up in Atlanta and graduated from Georgia Tech in industrial management in 1957. He entered the real estate business in 1959, and in 1967 obtained his broker's license and started his own company. Mr. Ottley, who has made his living since 1963 valuing property at the corners of major intersections, dealt with around 100 to 150 interchange properties between 1963 and 1979. In making his appraisal, Mr. Ottley checked the zoning of the property, called one of the Fulton County Commissioners, and went out and looked at and walked the property. Mr. Ottley appraised the property at $ 147,500. Petitioners filed joint Federal income tax returns for the taxable years 1979 and 1980 with the Internal Revenue Service Center in Atlanta, Georgia. On line 22 of Schedule A attached to their 1979 Federal income tax return, petitioners claimed a charitable contribution deduction for non-cash gifts in the amount of $ 150,300. This amount included the contribution of the .946 of an acre of undeveloped *260 real property located in Fulton County, Atlanta, Georgia, which petitioners valued on their return at $ 150,000. On their 1979 Federal income tax return, petitioners used $ 53,307 of the $ 150,000 deduction to reduce their 1979 Federal tax liability. Of the $ 150,000 deduction, $ 71,739 was carried over and used to reduce petitioners' 1980 Federal income tax liability. The remaining $ 24,954 of the $ 150,000 deduction was carried over to reduce petitioners' 1981 Federal income tax liability. Petitioners did not attach an appraisal to their 1979 or 1980 Federal income tax returns in support of their $ 150,000 valuation of the subject property. On line 24 of their 1979 and 1980 Federal income tax returns, petitioners claimed deductions attributable to employee business expenses in the following amounts: Year
Employee Business Deduction
1979
$ 18,965
1980
28,208
Prior to the issuance of a statutory notice of deficiency, the parties agreed that the amount of the deductions which were claimed as employee business expenses should be reduced by $ 5,886 in 1979 and by $ 8,087 in 1980 due to petitioners' failure to substantiate such amounts. Petitioners failed *261 to report on their 1979 tax return dividend income received during the taxable year 1979 in the amount of $ 3,556. Accordingly, the resulting deficiencies were assessed on March 8, 1983, and September 19, 1983, in the amounts of $ 3,103 for 1979 and $ 3,347 for 1980. On July 17, 1985, respondent mailed to petitioners a statutory notice of deficiency in which respondent determined that the value of the undeveloped real property donated by petitioner in 1979 was $ 20,000. Accordingly, respondent disallowed $ 33,307 of the $ 53,307 charitable contribution claimed in 1979 and $ 71,739 of the $ 71,739 charitable contribution claimed in 1980. In May of 1986, the subject property was rezoned to office/institutional use even though rezoning requests had previously been denied. William S. Stripling, petitioners' expert, attended Mercer University and received his Bachelor of Arts degree in economics from the Georgia State College School of Business Administration in 1967. Mr. Stripling is a member of the American Institute of Real Estate Appraisers, the Gwinnett County Board of Realtors, Inc., the Georgia Association of Realtors, Inc., the National Association of Realtors, Inc., the *262 Rho Epsilon National Real Estate Fraternity, and the International Right-of-Way Association. Mr. Stripling has taken a number of courses over the years from the American Institute of Real Estate Appraisers and has taught real estate appraisal courses for the Atlanta Area Technical School. Mr. Stripling has been in the appraisal business since 1964 and is licensed by the State of Georgia as a real estate broker. Since 1966, Mr. Stripling has appraised a variety of real estate properties including single family residences, vacant land, apartment buildings, office buildings, and shopping centers. Mr. Stripling has appraised properties for the Georgia Department of Transportation, Gwinnett County, Georgia Power Company, Colonial Pipeline, Ogelthorpe Power Corporation, the Federal government, city governments, and businesses such as banks and insurance companies. Before Georgia 400 was built, Mr. Stripling appraised properties in the area of Georgia 400 for the Georgia Department of Transportation. Mr. Stripling's firm handled the appraisal work for the proposed Georgia 400 for the Georgia Department of Transportation from Interstate 285 north to the Forsyth County line. After *263 he had done this work for the Georgia Department of Transportation, Mr. Stripling appraised various other properties in the Georgia 400 area. In February of 1986, Mr. Stripling made an appraisal of the subject property for petitioner. Mr. Stripling was told that the property had been valued at $ 145,000 - $ 150,000 for tax purposes. Mr. Stripling inspected the property and made an investigation into the market. Mr. Stripling found information on sales in the area of the subject property in a study he had previously done for another client. Based on these sales, Mr. Stripling concluded that a price of $ 145,000 for the subject property in 1979 was reasonable and represented the market value of the subject property. Mr. Stripling's comparable sale number one is a .62 acre lot located at least four miles from the subject property near the intersection of Interstate 285 and Georgia 400 and within a quarter of a mile of Perimeter Center, one of the prime areas in the Atlanta real estate market. The lot was zoned for official/institutional use and sold in August, 1979, for a price of $ 125,000 per acre. Mr. Stripling's comparable sale number two, a .954 acre lot, was also located *264 near the intersection of Interstate 285 and Georgia 400 and within a quarter of a mile of Perimeter Center. This property, which was zoned for office/institutional use, sold for $ 133,962 per acre in April of 1980. Mr. Stripling's comparable sale number three, also a .954 acre lot, was also located near the intersection of Interstate 285 and Georgia 400 and within a quarter of a mile of Perimeter Center. This property, which was zoned for office/institutional use, sold in April of 1980 for $ 133,962 per acre. Mr. Stripling's comparable sale number four was a .84 acre lot zoned for office/institutional use which sold in December 1978 for $ 154,761 per acre. Gregory J. Russack, respondent's expert, received his Bachelor of Science degree from the School of Commerce, Accounts and Finance at New York University. Mr. Russack received the designation of Member of the American Institute for Real Estate Appraisers in 1972. Mr. Russack is past president of Georgia Chapter 21 of the American Institute of Real Estate Appraisers and is past chairman of that organization's Candidate's Guidance Committee and appraisal review committee. In addition, Mr. Russack is a member of the American *265 Right-Of-Way Association, an affiliate member of the Atlanta Real Estate Board, and has been or is a member of other professional organizations such as the Society of Real Estate Appraisers and Consultants, and Mortgage Bankers of America. Mr. Russack has lectured on appraisal topics and participates in continuing education programs. Mr. Russack has conducted appraisals for private individuals, developers, lending institutions, and government agencies. Approximately 75 percent of the work performed by Mr. Russack is for individuals and approximately 25 percent is for government authorities. Mr. Russack has appraised real property in the vicinity of the subject property. Mr. Russack's personal residence is located within two miles of the subject property. Mr. Russack's office is about four miles south of the subject property. On September 3, 1986, Mr. Russack submitted to respondent his expert witness report. In the report, he appraised the subject property at $ 37,500 per acre, and estimated its fair market value as of December 26, 1979, at $ 35,000. Mr. Russack estimated the 1979 fair market value of the subject property by an analysis of comparable land sales located within *266 the general subject area. All of the sales used by Mr. Russack in his estimation of the fair market value of the subject property are located within approximately one mile of the subject property. Mr. Russack relied on seven sales to establish the fair market value of the subject property on December 26, 1979. Sale one occurred seven months prior to the date of valuation. Sale two occurred three months prior to the valuation date. Sales three and four both occurred during December, 1979, the month of valuation. Sale five occurred nine days after the date of valuation. Sale six consisted of two parts, one occurring twelve days after the date of valuation and the other occurring four months after the date of valuation. Sale seven occurred eight months after the date of valuation. Sales five, six, and seven were most significant to Mr. Russack's determination of the fair market value of the subject property. Mr. Russack's sale five was located a few hundred yards northwest of the subject property in the northwest quadrant area of Northridge Road and Roberts Drive. This property was zoned for apartments and sold at $ 40,002 per acre nine days after the date of valuation. The sale *267 was contingent upon a zoning change from apartment to office/institutional. The area where the property was located was designated for office use by the Fulton County comprehensive land use plan and the rezoning request was approved by the Fulton County Board of Commissioners. The tract had exposure and frontage on Georgia 400 and had all utilities except sewer, which was available approximately 750 feet away, near the intersection of Roberts Drive and Dunwoody Place. Sale six was a sale of four separate tracts. A 2.688 acre tract sold for $ 60,000 per acre twelve days after the valuation date. The remaining 35.6596 acres was sold four months after the date of valuation for $ 35,000 per acre. Part of the land was zoned light industrial and part was zoned office/institutional. All utilities were available. Approximately 22.228 acres of this property are located in the northeast corner of Roberts Drive and Dunwoody Place and the remaining 16.18 acres are located in the southeast corner of Roberts Drive and Dunwoody Place. Sale seven, 1.0962 acres of undeveloped land abutting the subject property directly to the north, sold eight months after the valuation date for $ 31,928 *268 per acre. All utilities except sewer were available and the property was zoned townhouse/residential. This property had been denied office/institutional rezoning prior to the sale. OPINION The first issue for our decision is the fair market value of property contributed by petitioner to the Clemson University IPTAY Club and the Clemson University Foundation on December 26, 1979. Section 170 allows an individual a deduction for charitable contributions, subject to certain percentage limitations, with a carryover for excess contributions. Secs. 170(b) and 170(d). If the charitable gift consists of property other than cash, the amount of the contribution is the fair market value of the property on the date of the donation, reduced, when necessary, as provided in section 170(e)(1). Sec. 1.170A-1(c)(1), Income Tax Regs. The fair market value of property is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of all relevant facts. *269 Sec. 1.170A-1(c)(2), Income Tax Regs. The fair market value of property on any given date is a question of fact to be determined from all of the relevant evidence in the record. Jarre v. Commissioner,64 T.C. 183, 188 (1975); Kaplan v. Commissioner,43 T.C. 663, 665 (1965). The parties have stipulated that the donees in this case were charities qualifying under section 170(b)(1)(A) at the time of the contribution. However, the parties disagree as to the fair market value of the donated property. A presumption of correctness attaches to respondent's determination of deficiency. Welch v. Helvering,290 U.S. 111 (1933). This presumption is a procedural device which requires petitioners to come forward with enough evidence to support a finding contrary to the determination. Rockwell v Commissioner,512 F.2d 882, 885 (9th Cir. 1975), affg. a Memorandum Opinion of this Court; see Fed. R. Evid. 301. Petitioners also bear the burden of proof. Rule 142(a). This burden is a burden of persuasion; *270 it requires petitioners to demonstrate the merits of their claim by at least a preponderance of the evidence. Rockwell v. Commissioner, supra.Respondent's presumption and petitioners' burden of proof thus impose two separate and distinct obligations: (1) the burden of going forward and (2) the burden of persuasion. Petitioners argue that the presumption of correctness in favor of respondent's determination disappeared because respondent's expert testified that the fair market value of the subject property was $ 35,000. On brief, respondent conceded that the fair market value of the subject property was at least $ 35,000 on the date of the donation. Petitioners apparently feel that respondent's partial concession somehow removed their burden of proof. We do not agree. Rule 142(a) provides that "The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court; and except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in his answer, it shall be upon respondent." Respondent *271 has not pleaded any new matter in his answer. Certainly the concession made by respondent cannot be construed as a new matter which would require that the burden of proof be placed on respondent as to such new matter. Consequently, respondent's partial concession has no effect on the burden of proof in this case. Petitioners' reliance upon Herbert v. Commissioner,377 F.2d 65 (9th Cir. 1966), revg. a Memorandum Opinion of this Court, is misplaced. Since appeal in the instant case lies in the Eleventh Circuit, we are bound to follow the Eleventh Circuit Court of Appeals. Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). Any case arising in the Fifth Circuit before the organization of the Eleventh Circuit on October 1, 1981, is considered binding precedent on the Eleventh Circuit until such time as the Eleventh Circuit sitting en banc shall deviate therefrom. Bonner v. City of Prichard, Alabama,661 F.2d 1206 (11th Cir. 1981). The Fifth Circuit *272 Court of Appeals in MacGuire v. Commissioner,450 F.2d 1239 (5th Cir. 1971), stated that "The burden was on the taxpayers to establish by a preponderance of the evidence" the merits of their claim. The Fifth Circuit went on to state that "That burden is not shifted by the mere fact that the taxpayers introduced evidence on their behalf (citing United Aniline Co. v. Commissioner,316 F.2d 701 (1st Cir. 1963)). The Fifth Circuit apparently accepted the rule of the First Circuit as set forth in United Aniline Co. v. Commissioner, supra.In that case, the First Circuit Court of Appeals states that "the taxpayer never loses the burden of proving the Commissioner's determination erroneous." Consequently, we find that the burden of proof remains on petitioners in the instant case. To meet their burden of going forward with the evidence, petitioners must come forward with enough evidence to support a finding contrary to respondent's determination. Rockwell v. Commissioner, supra. Petitioners have introduced expert testimony *273 that supports their claim regarding the fair market value of the subject property. Therefore, petitioners have met their burden of going forward with the evidence on the issue of fair market value. While petitioners have met their burden of going forward, they must still carry their ultimate burden of persuasion. Rockwell v. Commissioner, supra;United States v. Rexach,482 F.2d 10, 16 (1st Cir. 1973), cert. denied 414 U.S. 1039 (1973). Petitioner's evidence on the issue of valuation consisted primarily of his own testimony, the testimony of Mr. Ottley, and the testimony of his expert, Mr. Stripling. Petitioner testified he believed the fair market value of the property at the date of the gift to be $ 150,000. Petitioner's opinion as to the fair market value of his property was based primarily on conversations with other people and the appraisal by Mr. Ottley. Petitioner did not attempt to estimate the value of his property by personally investigating the value of comparable property. Therefore, we give petitioner's testimony little weight on the issue of the fair market value of the subject property. We give more weight to the *274 testimony of Mr. Ottley, who makes his living valuing properties at interchanges. Mr. Ottley valued the subject property at $ 147,500 after walking the property and doing research which included checking the zoning of the property. However, the record does not indicate that Mr. Ottley investigated the prices of comparable property in valuing the subject property. The major factors in Mr. Ottley's valuation appear to be the location of the property and Mr. Ottley's belief that the property could easily be rezoned for business uses. However, the record does not show how Mr. Ottley arrived at a value of $ 147,500. Accordingly, while we give some weight to Mr. Ottley's testimony on the issue of valuation, we do not consider it determinative. Petitioner and respondent each rely upon valuations prepared by their respective experts. Expert opinion is admissible if it will assist the trier of fact to understand evidence that will determine a fact in issue. See Fed. R. Evid. 702. The trier of fact must weigh such evidence in light of the demonstrated qualifications of the expert and all other *275 credible evidence. Estate of Christ v. Commissioner,480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970). We are not bound by the opinion of any expert witness when that opinion is contrary to our judgment. Kreis' Estate v. Commissioner,227 F.2d 753, 755 (6th Cir. 1955). We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. Helvering v. National Grocery Co.,304 U.S. 282 (1938). We may find one expert more persuasive on one element of valuation and another more persuasive on another element. Petitioner's expert, Mr. Stripling, was experienced at valuing property in the area of the subject property. Mr. Stripling based his valuation on a comparison with three sales near highway interchanges and one sale not close to an interchange. Since the subject property was near an interchange, we feel that his first three comparable sales were good comparisons in this respect. However, there are two major problems with Mr. Stripling's valuation. First, he apparently did not discount the value of the subject property for being zoned residential. All of Mr. Stripling's comparable *276 sales were zoned office/institutional, and sale four was actually being developed as part of a shopping mall, but Mr. Stripling did not make a downward adjustment in his estimate to reflect the cost of getting the subject property rezoned and the possibility that the property might not be rezoned. We find that Mr. Stripling erred in not making a downward adjustment to reflect the zoning of the subject property. Second, none of Mr. Stripling's comparable sales are within one mile of the subject property, and some of his comparable sales are as far away as five or six miles. Sales one, two, and three are located near Interstate 285 and Perimeter Center, one of the prime areas in the Atlanta real estate market. Mr. Stripling testified that the proximity of sales one, two, and three to Interstate 285 and Perimeter Center would cause those sales' prices to be higher than they would be if they were in a different location. Based on this testimony, Mr. Stripling should have made a downward adjustment to the prices of sales one, two and three to establish the fair market value of the subject property. *277 Instead, Mr. Stripling made an upward adjustment. We find that Mr. Stripling erred in failing to make a downward adjustment to reflect the inferior location of the subject property in relation to his comparable sales one, two, and three. Respondent's expert, Mr. Russack, also based his valuation on an analysis of comparable sales. Petitioners contend that Mr. Russack's valuation is incorrect for two major reasons. First, petitioners submit that Mr. Russack's estimate of the probability of rezoning of the subject property was too low. We find petitioner's argument regarding the probability of rezoning convincing. Mr. Russack's testimony regarding the probability of rezoning is inconsistent. Although Mr. Russack testified that the probability of obtaining rezoning was "nil" or "remote," he testified that the highest and best use of the subject property at the date of valuation was to be held for investment until conditions warranted change to a zoning such as office/institutional. We find inherent in Mr. Russack's statement that the highest and best use was to be held until conditions *278 warranted a change in zoning the belief that ultimately there would be a change in zoning. Accordingly, we find Mr. Russack's opinion of the highest and best use of the property to be inconsistent with his statement regarding the probability of the property's being rezoned. Petitioners have introduced evidence that the chances of rezoning the subject property were good. Mr. Ottley testified that the subject property could easily be rezoned if a bank owned the subject property and wanted to put a branch location there. Mr. Stripling testified that his valuation reflected both the zoning at the time of the donation and the possibility that the property would be rezoned. Mr. Stripling testified that the likelihood that the property would be rezoned increased as time went on because of the level of development activity occurring in the area. Respondent's witness, Nancy Leathers, Deputy Director of the Fulton County Department of Planning and Economic Development, testified that the subject property was rezoned to office/institutional use in 1986 even though the planning department recommended denial and the county's comprehensive land use plan had not changed since 1978. Therefore, *279 even though the existence of the comprehensive land use plan may have reduced the probability of the subject property's being rezoned, it did not eliminate the possibility because the Board of Commissioners did not always follow the comprehensive plan. We conclude that at the date of the donation there was a possibility that the property would be rezoned and that Mr. Russack did not give adequate consideration to this possibility in making his valuation. Petitioner's second argument is that respondent's expert's comparable sales do not represent the value of properties at interchange locations. Mr. Russack considered his comparable sales five, six, and seven to be most significant in determining the value of the subject property. We find that Mr. Russack underestimated the fair market value of the subject property due to his failure to take into account significant differences between the subject property and his comparable sales. Although sales number five and six were located near the subject property, neither has direct access to the interchange of Georgia 400 and Roberts Road. The subject property has access to this interchange, which is one of only two interchanges on the *280 approximately 12-mile section of Georgia 400 between Interstate 285 and the Chattahoochee River. Mr. Russack's testimony and report do not indicate that Mr. Russack considered accessibility to the interchange on Georgia 400 to be of any value to the subject property. Petitioner's expert, Mr. Stripling, testified that Mr. Russack's sales five and six were not comparable to the subject property because they were not on an interchange. We consider Mr. Stripling's testimony convincing on this point. We agree with petitioner that location is an important factor in determining the fair market value of the subject property. We conclude that Mr. Russack erred in disregarding the value of access to an interchange in valuing the subject property. Respondent contends that the lack of available sewer should be considered by the Court in determining the fair market value of the subject property. In his report, Mr. Russack stated that the subject property could be connected to county sewerage in two ways. One option would cost approximately $ 155,000. Mr. Russack did not estimate the cost of the less *281 expensive option. The only indication Mr. Russack gave regarding the cost of the less expensive connection was his statement that the cost would be above normal in comparison with sewer available at the site. No evidence before this Court enables us to estimate the cost of connection to a sewer line. Moreover, of the three comparable sales Mr. Russack considered most significant in valuing the subject property, two did not have sewer. Therefore, while we agree that the availability of sewer is a factor that would affect the value of the subject property, we do not make a downward adjustment from the value of Mr. Russack's sales five, six, and seven to reflect the subject property's lack of sewer. No downward adjustment from the value of sales five and seven is required because neither of those properties had sewer available. We do not make a downward adjustment from the value of sale six, which had sewer available, because there is no evidence before the Court which allows us to estimate the cost of connection to a sewer line. After examining all the relevant evidence, we find that the value of the subject property at the time of the charitable donation was $ 95,000. We reach *282 this determination by weighing the credibility of the witnesses and adjusting the values of the experts' comparable sales upward or downward as considered appropriate. We find that both experts miscalculated the chances of the subject property's being rezoned. We consider Mr. Stripling's sales one, two, and three to be the most similar of his comparable sales to the subject property. We make a downward adjustment from the value of those sales to reach the $ 95,000 value of the subject property. Our downward adjustment reflects the inferior location of the subject property relative to sales one, two, and three. We consider Mr. Russack's sales five, six, and seven to be most similar of his comparable sales to the subject property. We adjust the value of these sales upward to reflect the superior location of the subject property relative to these sales. We note that neither party argued that the seven year restriction on the donees' ability to transfer the subject property had any effect on valuation. Since the restriction is not in the deed of gift and neither party argued that the value of the subject property was affected by the restriction, we have not adjusted the value of the *283 subject property to reflect the restriction. It is not unusual in valuation cases that two expert appraisers reach significantly different conclusions. However, the reports and testimony of the experts in this case are so dissimilar that the reliability of the experts is brought into question. We are puzzled how a buyer or seller can rely on valuations by expert appraisers when these valuations can vary so greatly. Perhaps both experts were too "result oriented" in this case. We are disturbed by the trend toward some experts acting in an adversarial manner instead of an objective manner. "Something is rotten in the state of Denmark" [3] when two qualified appraisers cannot come anywhere near agreement on the value of a piece of property. We admonish the expert witnesses that they are not intended to be advocates. The purpose of expert testimony is to assist the trier of fact to understand evidence that will determine a fact in issue. See Fed. R. Evid. 702. When an expert assumes the position of an advocate, this purpose is in jeopardy and the Court is not aided in its ultimate *284 determination. The second issue for our consideration is whether petitioners are liable for an addition to tax under section 6653(a) for the taxable years 1979 and 1980. Section 6653(a) provides for additions to tax if any part of the underpayment is due to negligence or an intentional disregard of rules or regulations. Under section 6653(a), negligence is a lack of due care or a failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). Petitioners bear the burden of proving that respondent's determinations are incorrect. Rule 142(a). Petitioners incorrectly cite Kilborn v. Commissioner,29 T.C. 102 (1957), revd. on other issues (5th Cir. 1958, 2 AFTR 2d 5812, 58-2 USTC par. 9847). revd. per curiam 360 U.S. 715 (1959), for the proposition that respondent must establish a prima facie case for negligence before the burden of proof is placed on petitioners. In Kilborn, we did not discuss such *285 a possibility, much less set forth a rule such as the one petitioners attribute to us. In this Court, petitioners bear the burden of proof so there is no need for respondent to take action to place the burden on petitioners. Rule 142(a). Since we have decided that the value of the subject property was $ 95,000, petitioners are entitled to their entire claimed charitable deduction attributable to that property for 1979 of $ 53,307. Therefore, petitioners' underpayment of tax for 1979 was due to overstated employee business expenses and unreported dividend income. Petitioners have introduced no evidence to show that this underpayment was not due to negligence or intentional disregard of rules and regulations. Consequently, petitioners have not met their burden of proof on this issue. Accordingly, we sustain the addition to tax under section 6653(a) for 1979. Petitioners' underpayment of tax for 1980 was due to an overstatement of the value of their charitable contribution to Clemson University and to overstatement of employee business expenses. Again, petitioners have introduced *286 no evidence to show that the overstatement of employee business expenses was not due to negligence or the intentional disregard of rules and regulations. Accordingly, petitioners have again failed to meet their burden of proving that no part of the underpayment was due to negligence or intentional disregard of rules and regulations. Consequently, we need not address the question of whether the part of the underpayment resulting from the overvaluation of the donated property was due to negligence or the intentional disregard of rules and regulations, and the addition to tax under section 6653(a) for 1980 is sustained. We have considered petitioners' other arguments and find that they are without merit. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. In his notice of deficiency to petitioners, respondent determined that the fair market value of the subject property was $ 20,000 on December 26, 1979. Respondent concedes that the subject property was worth at least $ 35,000 on that date. The notice of deficiency sent to petitioners listed agreed- to adjustments of $ 9,442 for 1979 and $ 8,087 for 1980.↩
3. Hamlet, Act I, Sc. iv, line 90.↩